IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 20, 2019

**PAUL BRENT BAXTER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
**No. 17832-PC      Forest A. Durard, Jr., Judge**

**No. M2018-00592-CCA-R3-PC**

In 2014, the Petitioner, Paul Brent Baxter, was convicted of aggravated assault and aggravated kidnapping, and the trial court sentenced him to serve thirty-five years. The Defendant appealed his convictions to this court, and we affirmed the judgments. *State v. Paul Brent Baxter*, No. M2015-00939-CCA-R3-CD, 2016 WL 2928266 (Tenn. Crim. App., at Nashville, May 16, 2016), *perm. app. denied* (Tenn. Sept. 23, 2016). Subsequently, the Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Roger D. Layne, Chattanooga, Tennessee, for the appellant, Paul Brent Baxter.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert J. Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Background**

This case originates from the Petitioner's assault and kidnapping of the victim, who was his girlfriend and roommate. Based on this incident, a Bedford County grand jury indicted the Petitioner for aggravated assault and aggravated kidnapping.

**A. Trial**

The following is a summary by this court of the facts presented at trial:

The victim and the [Petitioner] began dating in early 2013 and got an apartment together in Shelbyville in October 2013. The victim described their relationship as "[t]errible" and stated that the [Petitioner] was "very controlling" and beat her "all the time."

The victim testified that, on the evening of November 1, 2013, she and the [Petitioner] argued over money when she discovered that money was missing from her account where she received her social security disability payments. The [Petitioner] admitted to taking all of the money out of the victim's account and buying crack cocaine with it. According to the victim, she was the only one with any income, and she, therefore, kept asking the [Petitioner] how he proposed to pay their bills, which were due. According to the victim, the verbal disagreement, which began around 7:00 or 8:00 p.m., continued past midnight into November 2.

The [Petitioner] was sitting on the couch smoking crack cocaine when the argument started up again. According to the victim, it turned physical when he got up and punched her in the face. The victim testified that, after this hit, she ran away from the [Petitioner] and started beating on the walls yelling "help" in an attempt to grab a neighbor's attention. When she moved for the front door, the [Petitioner] grabbed her by the neck with both hands and pressed his thumbs on the center of her throat. The victim, who had previously had "a [metal] plate, two screws[,] and [a] donor bone[,]" surgically implanted in her neck as the result of a car accident when she was a teenager, believed that the [Petitioner] was trying to paralyze her—she stated that he was applying pressure "really hard" to the scar on her neck where he knew she had the plate and screws. The victim also testified that she suffered from degenerative disk disease and spinal stenosis. According to the victim, the [Petitioner's] grip on her neck was very painful and caused her to have difficulty breathing.

When the [Petitioner] finally let go of the victim, he punched her hard in the eye, causing her to go "flying back" onto the kitchen floor. The victim said that she was "crying and hollering" because the hit to her eye caused "[a] lot of pain" and that her back "was in excruciating pain" from hitting the floor.

The [Petitioner] then dragged the victim into the bathroom of their

2

bedroom where he placed his foot on her head, trying to her hold her down while she screamed. She stated that she was unable to breathe as a result. According to the victim, the [Petitioner] then began "jerking" her head, which pulled some of her hair out. When she was able to turn her head to the side, she begged the [Petitioner] to stop. When he finally stopped, the victim asked to leave, even offering the [Petitioner] money to let her go; however, the [Petitioner] refused to let her go until the bruising on her face subsided. She agreed to stay so the beating would cease, feeling that she had no other options. The victim opined that, if she had tried to leave, she "probably would have been killed."

After the physical altercation subsided, the [Petitioner] and the victim went to bed. He made her promise not to leave. Once the [Petitioner] was asleep, the victim crawled onto the floor and obtained the [Petitioner's] cell phone. The victim testified that she crept into the laundry room where she called her sister, Sharon Tyree, sometime between 3:00 and 4:00 a.m., to come pick her up because the [Petitioner] had beat her up again. The victim then snuck out of the apartment and began walking, trying to avoid detection in case the [Petitioner] had awakened and was coming after her. According to the victim, she hid in the "dark spots" until her sister arrived.

When Ms. Tyree encountered the victim, she saw that the victim's face was badly bruised and her eye was swollen from the beating, so she took the victim to the emergency room ("ER") at Maury County Regional Medical Center, arriving around 6:00 a.m. The victim was evaluated by April Pearl, an ER physician.

According to Dr. Pearl, the ninety-seven-pound victim reported that she had been punched, pushed, stomped, kicked, and choked by her boyfriend. The victim also reported that she had been seen in the ER previously due to an assault. Due to the victim's injuries, Dr. Pearl had a CAT scan done of the victim's head and x-rays of her ribs. Dr. Pearl determined that there was "soft-tissue swelling" around the victim's eye but no facial broken bones. Dr. Pearl explained that soft-tissue swelling usually dissipates within twenty-four to forty-eight hours after the injury occurs; so in Dr. Pearl's opinion, the eye injury had been recently inflicted, and the victim's explanation of her injuries was consistent with what Dr. Pearl had observed. Dr. Pearl also did not believe that the victim's eye injury was likely to have occurred during a car accident. The victim was released from the hospital later that morning around 9:00 a.m.

3

After the emergency room visit, the victim went to her parents' house. The victim's mother thereafter escorted the victim to the Shelbyville Police Department ("SPD"), where the victim reported the [Petitioner's] abuse to Officer Bobby Peacock.

Officer Peacock testified that the victim had visible, recent injuries when she arrived at the police station—a "prominent black eye[,]" "red marks" on her neck around a healed surgical incision, bruising on her arm and shoulder, and thinned hair spots where it appeared her hair had been ripped out. He photographed these injuries, which were admitted as trial exhibits. Officer Peacock obtained a warrant for the [Petitioner's] arrest.

SPD Detective Carol Jean obtained a written statement from the victim on April 14, 2014, at the request of the District Attorney's Office. Det. Jean reported that the victim identified the [Petitioner] as the cause of her November 2013 injuries.

At trial, the victim admitted that she had been smoking crack cocaine with the [Petitioner] the night of the argument. She also acknowledged that she returned to the relationship following the November 2013 beating and that she had "take [n] up for him" after his arrest. On cross-examination, the victim conceded that she spoke with the [Petitioner's] lawyer in general sessions court several months prior to trial and that, when questioned by the [Petitioner's] attorney at that time, she denied the allegations of abuse, stating to him that the [Petitioner] had not kidnapped her or beaten her. She confirmed that she was in a car accident on Halloween night and agreed that she had told the [Petitioner's] brother that her face was injured in the wreck. Furthermore, the victim acknowledged that she wrote a letter on December 18, 2013, wherein she stated that the [Petitioner] did not cause her injuries. According to the victim, the victim's mother escorted her to a notary public, where the victim's signature was notarized. The victim explained that it was not her idea to write the letter but that she authored the letter anyway "to keep the beatings down" and because the [Petitioner] was threatening her family.

The defense presented the [Petitioner's] brother, Anthony Dewayne Polly, who testified that he was at a friend's house on October 31, 2013, when he received a call that the victim and the [Petitioner] had been involved in a car accident. He sent his girlfriend to pick them up. When the victim and the [Petitioner] arrived, they purchased some crack cocaine

4

and began smoking it. Mr. Polly observed that the victim's right eye was red, and she was complaining of pain in her shoulder. According to Mr. Polly, the victim explained that she had been injured during the car accident. He and his girlfriend drove the couple back to Shelbyville that evening.

The [Petitioner] testified on his own behalf, stating that he first met the victim when he sold her some pills. He claimed that he "hustled pretty good money" and "made pretty good money just piddling." He also said that he and the victim smoked about $4,000–worth of crack cocaine monthly. According to the [Petitioner], his relationship with the victim was "wonderful" at first but became difficult due to the victim's worsening drug addiction.

He denied the allegations of abuse and claimed that the victim's injuries resulted from the Halloween car wreck. According to the [Petitioner], his car was totaled in the accident and had to be towed from the scene. He further maintained that they argued on November 1, 2013, because he refused to go buy more crack cocaine for the victim. Regarding the victim's disability account, the [Petitioner] stated that he never had access to it because the victim's mother was the only one with access to it at that time. While he agreed that there was pushing and shoving that evening, he asserted that he never hit the victim in the eye or stomped her head. According to the [Petitioner], he did not pull out the victim's hair but instead posited that her thinned spots were from where she had previously gotten gum stuck in it. He also claimed that the victim was free to leave at any time during the disagreement. The [Petitioner] explained that, if he "wanted to her hold against her will to keep her from leaving," then he "would have hogtied her" and "gagged her[.]"

The [Petitioner] testified that he did not coach the victim or tell her what to say in the notarized letter. He also denied ever threatening the victim's family. The [Petitioner] claimed that the victim's mother did not like him and insinuated that her mother took the victim to the police station to "put the charges" on him.

*Baxter*, 2016 WL 2928266, at *1-3. The jury convicted the Petitioner as charged, and the trial court sentenced him to fifteen years for the aggravated assault conviction with a consecutive sentence of twenty years for the aggravated kidnapping conviction.

**B. Post-Conviction Proceedings**

5

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel when counsel: (1) failed to raise multiple issues in the Petitioner's motion for new trial and on appeal; (2) failed to investigate a motor vehicle collision as a possible cause of the victim's injuries; and (3) erroneously allowed evidence to be admitted at trial.

The following evidence was presented at a hearing on the petition: Jackie Robertson testified that he worked for the Lewisburg Police Department ("LPD") in 2013 and that he responded to a motor vehicle incident on November 1, 2013. The Petitioner was the driver of one of the vehicles involved in the collision. The victim was a passenger in his vehicle. The vehicle sustained "front-end damage" and was "disabled."

On cross-examination, Officer Robertson stated that he did not observe any injuries on the victim.

Carol Jean testified that she worked as a detective with the Shelbyville Police Department and that she testified in the Petitioner's trial regarding his assault on the victim. The victim identified the Petitioner as the person who assaulted her in an April 2014 statement to Detective Jean. Detective Jean recalled testifying at trial to a specific statistic with regard to domestic abuse: that victims of abuse return to their abusers an average of seven times before ending the relationship. She stated that she recited this statistic from "Haven of Hope" and other expert opinions. Detective Jean stated that she had experience with cases of domestic violence and had been trained on the topic.

Counsel testified that he worked for the Public Defender's Office and was appointed to represent the Petitioner in this case. Counsel testified that he was aware of the Petitioner's and the victim's motor vehicle collision and that he reviewed the accident report. Counsel spoke to an officer who was present at the scene of the collision, as well as a tow truck driver and several other witnesses. The officer and the tow truck driver reported that there were no injuries resulting from this collision. Counsel specifically recalled discussing with the officer the victim's physical condition following the collision.

At the Petitioner's trial, mention was made of the Petitioner's prior alleged assaults on the victim and other individuals; Counsel objected to the relevancy of other individuals' reports to the present case. Counsel recalled several unusual incidents that occurred throughout the Petitioner's trial, including a witness coming into the courtroom without permission and a juror talking with a law enforcement witness. He also stated that the trial court declined to enter into evidence the victim's letter absolving the Petitioner of blame for the assault.

6

Counsel testified that he filed a motion for new trial and alleged that the evidence was insufficient to sustain the Petitioner's convictions and that his sentence was excessive.

On cross-examination, Counsel testified that he communicated with the Petitioner while he prepared the Petitioner's case and had multiple conversations with the Petitioner about his defense and the evidence the State sought to present. The Petitioner told Counsel about the motor vehicle collision, which led Counsel to obtain the accident report. The report stated that the victim had no injuries. The eye witnesses that Counsel spoke to confirmed this report. Pursuing a potential defense that the victim had suffered her injuries during the collision, Counsel attempted to interview Dr. Pearl, hoping the doctor would report that the victim's injuries could have been sustained in a car crash. The doctor was unwilling to make that statement or offer a second opinion. Counsel reiterated that his trial strategy was to use the victim's letter wherein she stated that the Petitioner had not caused her injuries; Counsel read the victim's letter aloud for the jury during her testimony. The trial court would not allow the letter to be entered into the record because it was not for impeachment purposes; indeed, the victim did not deny that it was her statement. Counsel felt that the jury got the next best thing, a reading aloud of the letter.

Counsel recalled that he met with the Petitioner's mother several times but anticipated that she would not make a good witness at trial, so he and the Petitioner opted not to call her. Counsel stated that the incident involving the witness coming into the courtroom without permission was addressed by the trial court; the witness did not hear any testimony related to the Petitioner's case, and the person she spoke with was simply a spectator. Counsel also brought it to the attention of the trial court that a juror spoke with a law enforcement witness; Counsel did not feel the exchange had any impact on the Petitioner's trial. Counsel stated that he would have asked for a mistrial had there been evidence of any violations of court rules.

Counsel testified that he cross-examined the victim about her drug use and other credibility issues; however, the police photographs of her injuries, which were consistent with her testimony, were strong evidence supporting the State's case.

The post-conviction court issued an order denying the petition, making the following findings relevant to the issues in this appeal:

> [Automobile Accident] The jury heard sufficient testimony regarding this issue and, by their verdict, rejected this assertion by [the] [P]etitioner that the accident was the source of the victim's injuries. . . .

7

[Testimony of Prior Assaults]  The trial court did allow testimony [about the Petitioner's prior assaults on the victim] to the extent that it demonstrated the turbulent relationship between the victim and the [P]etitioner, but advised the jury they were only to consider the events . . . for determining the guilty or innocence of the [P]etitioner.  . . . .  The post[-]conviction court characterizes this as a . . . non-constitutional error which does not require automatic reversal.  . . . .  While this evidence [of the Petitioner's prior assault on the victim] should not have been admitted there is no evidence showing within a reason[able] probability its absence would have resulted in a different verdict considering the gravity of the proof in this case . . . .

[Detective Jean's testimony]  [The detective] opined through her training, victims of abuse return to their abuser an average of 7 times before breaking the cycle and ending the relationship.  This was objected to by [Counsel] claiming the witness was not an expert . . .  The trial court determined Detective Jean would be permitted to state the statistic but gave the jury the instruction they were free to accept or reject that testimony as they saw fit. . . .  Irrespective of the admissibility of this evidence and whether [Counsel] was deficient for not raising the issue on appeal, it could not be said the omission of the statistical evidence would have created a reasonable probability of a different verdict in this trial.  This evidence was only a small part of a few pages in the transcript in a strong case and the prosecutor quickly moved on to questions on a different topic.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel because: (1) Counsel failed to adequately investigate and present as a possible cause of the victim's injuries the automobile accident she and the Petitioner were involved in; (2) Counsel failed to argue in the motion for new trial and on appeal the error of allowing testimony about the Petitioner's prior assaults on the victim; (3) Counsel failed to argue in the motion for new trial and on appeal the error of allowing Detective Jean to testify about abuse victims' behavior; and (4) the cumulative effect of these errors violated the Petitioner's right to a fair trial and his right to effective legal representation.  The State responds that the evidence does not preponderate against the trial court's finding that Counsel adequately investigated the vehicle collision.  The State further responds that

because Counsel was not questioned at the post-conviction hearing about why he did not raise certain issues in the motion for new trial or on appeal, the Petitioner's remaining arguments must fail. The State also argues that Counsel's failure to raise the issues did not prejudice the Petitioner on appeal. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at

936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The evidence presented in this case does not preponderate against the post-conviction court's findings that Counsel adequately investigated the vehicle collision as a potential cause of the victim's injuries. The evidence presented was that Counsel obtained the police accident report, which did not indicate that the victim was injured. Counsel further interviewed the responding officer and the tow truck driver, both witnesses to the immediate aftermath of the collision, and neither recalled any injuries to the victim. The doctor who examined the victim refused to make a statement that her

injuries could have been caused by a collision. Counsel testified that this investigation informed his defense strategy at trial and that he opted to pursue the victim's letter stating that the Petitioner had not assaulted her as the primary defense. This was a strategic tactical choice, made after adequate preparation on the part of Counsel, that did not deprive the Petitioner of effective representation and we will not second guess this decision on appeal. Indeed, Counsel's pretrial investigation revealed that the victim had not been injured in the collision and thus it would not have been particularly effective to pursue that avenue as the Petitioner's primary defense. Furthermore, the jury heard testimony from witnesses testifying on behalf of the Petitioner that the victim had been injured in the collision. Accordingly, the Petitioner is not entitled to relief as to this issue.

As to his claim that Counsel was ineffective for failing to raise two issues in the motion for new trial or on appeal, no testimony regarding these issues was presented at the post-conviction hearing. Based on the evidence presented at trial, however, we conclude that the evidence does not preponderate against the post-conviction court's findings that neither of the alleged errors prejudiced the Petitioner or affected the outcome of the trial. As to the trial testimony that the Petitioner had assaulted the victim in the past, the evidence was that the trial court gave a limiting instruction to the jury. Regarding Detective Jean's testimony, the evidence was that she made one general statement about abuse victims' behavior and nothing more. Considering the strength of the State's proof as a whole, we conclude that the testimony regarding these two issues did not affect the outcome of the trial, and thus, Counsel was not ineffective for failing to present them on appeal. As we have concluded that no errors were made in the post-conviction's court judgment, the Petitioner's claim that the cumulative effect of any errors warrants reversal of that judgment is moot. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE